**Margaret Dye SUDAN, now known as Maggie Mackenzie, Appellant**

v.

**Philip P. SUDAN, Jr., Appellee.**

**No. 14–01–00854–CV.**

Court of Appeals of Texas,
Houston (14th Dist.).

June 17, 2004.

Rehearing Overruled Sept. 30, 2004.

Katherine J. Walters, Austin, Ellen Elkins Grimes, Houston, for appellant.

J.D. Bucky Allshouse, Mark S. Hellinger, Houston, for appellee.

Panel consists of Justices HUDSON, EDELMAN, and SEYMORE.

## OPINION ON THIRD MOTION
## FOR REHEARING

RICHARD H. EDELMAN, Justice.

Appellant's and Appellee's motions for rehearing are overruled, our opinions issued in this case on January 15, 2004 are withdrawn, and the following majority and dissenting opinions are issued in their place.

In this case to enforce an agreement incident to divorce, Margaret Dye Sudan, now known as Maggie Mackenzie ("Mackenzie"), appeals a summary judgment

granted in favor of Philip P. Sudan, Jr. ("Sudan") and the denial of her own motion for summary judgment. We affirm in part and reverse and remand in part.

## Background

In 1993, the parties entered into an agreement incident to their divorce (the "agreement") that was incorporated into their divorce decree (the "decree").[1] In 1998, the parties entered into an amendment to the agreement (the "amendment"). Sudan thereafter made no further payments to Mackenzie under the agreement.[2] In 1999, Mackenzie sued Sudan for rescission of the amendment, breach of the agreement, intentional infliction of emotional distress, and tortious interference. After the parties filed cross motions for summary judgment, the trial court granted Sudan a partial summary judgment, denied Mackenzie's motion, and severed the remaining claims.[3]

## Standard of Review

A traditional summary judgment may be granted if the motion and summary judgment evidence show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion or response. Tex.R. Civ. P. 166a(c). In reviewing a traditional motion for summary judgment, we take all evidence favorable to the nonmovant as true and resolve every doubt, and indulge every reasonable inference, in the nonmovant's favor. *Tex. Commerce Bank, N.A. v. Grizzle*, 96 S.W.3d 240, 252 (Tex.2002).

A no-evidence motion for summary judgment must be granted if: (1) the moving party asserts that there is no evidence of one or more specified elements of a claim or defense on which the adverse party would have the burden of proof at trial; and (2) the respondent produces no summary judgment evidence raising a genuine issue of material fact on those elements. *See* Tex.R. Civ. P. 166a(i). In reviewing a no-evidence summary judgment, we review the evidence in the light most favorable to the nonmovant, disregarding all contrary evidence and inferences, to determine whether more than a scintilla of probative evidence was presented on the challenged elements of the nonmovant's claim. *See King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (2003). Where summary judgment has been requested by both sides, granted to one, and denied to the other, we determine all questions presented and, if the judgment is in error, render that which the trial court should have rendered. *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 605 (Tex.2002).

## Validity of Amendment

In seeking summary judgment against Mackenzie's claims for breach of his obligations under the agreement and decree, Sudan relied principally on the amendment to support his defenses of modification, ratification, release, accord and satisfaction, payment, waiver, estoppel, and novation. Mackenzie challenged the validity of the amendment on the three grounds discussed below.

1. At the time of the parties' divorce, they had two minor children (the "children") born in 1981 and 1982, respectively.

2. This is according to Mackenzie's affidavit, which we take as true for summary judgment purposes.

3. The remaining claims, which are not part of this appeal, include non-payment of child support, life insurance premiums, and attorney's fees.

### Lack of Court Approval

■ Mackenzie's first and fourth issues challenge the granting of Sudan's motion for summary judgment to the extent it was based on the amendment. Among other things, she contends that, because the amendment concerned child support and/or implicated a child's best interest, it could not be effective to modify the agreement and decree without court approval.[4]

■ In Texas, the Legislature has explicitly required that parental agreements concerning child support be expressly approved by the court based on whether the agreement is in the child's best interest.[5] Accordingly, agreements by parents to reduce or modify court-ordered child support obligations without such approval violate public policy and are unenforceable.[6] However, Mackenzie's claims for child support are not before us in this appeal,[7] and her brief cites no authority providing that the amendment could not validly modify obligations under the agreement and decree other than for child support without court approval. Accordingly, her challenges to the amendment based on lack of court approval afford no basis for relief with regard to the claims at issue in this appeal[8] and are overruled.

### Adequacy of Consideration

■ Mackenzie contends that the amendment was unenforceable for lack of, or inadequate, consideration because Mackenzie received only $30,000 that Sudan already owed her under the agreement while relinquishing over $500,000 in future payments and the value of their home, approximately $900,000.

■ A contract that lacks consideration is unenforceable. *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 409 (Tex.1997). What constitutes consideration for a contract is a question of law. *Brownwood Ross Co. v. Maverick County*, 936 S.W.2d 42, 45 (Tex.App.-San Antonio 1996, writ denied). Consideration can be either a benefit to the promisor or a loss or detriment to the promisee, including surrendering a legal right. *N. Natural Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603, 607 (Tex. 1998). Payment by a debtor before payment is due of an amount less than would ultimately have been required is sufficient consideration to support the creditor's agreement to accept the payment in full satisfaction of the total amount due. *Neeley v. Southwestern Inv. Co.*, 430 S.W.2d 465, 468 (Tex.1968). In that the $30,000 Mackenzie received for entering into the amendment was paid and accepted before

---

4. It is undisputed that no best interest determination or other court approval was sought or obtained with regard to the amendment.

5. *Williams v. Patton*, 821 S.W.2d 141, 143–44 (Tex.1991) (citing former Family Code Section 14.06, currently Tex. Fam.Code Ann. § 154.124 (Vernon 2002), and explaining at length the policy reasons for requiring courts to expressly determine whether agreements regarding child support are in the child's best interest).

6. *State v. Borchers*, 805 S.W.2d 880, 882 (Tex. App.-San Antonio 1991, writ denied); *Rogers v. Griffin*, 774 S.W.2d 706, 707 (Tex.App.-Texarkana 1989, no writ); *Shannon v. Fowler*,

693 S.W.2d 54, 57 (Tex.App.-Fort Worth 1985, writ dism'd); *Ex parte Payne*, 598 S.W.2d 312, 317 (Tex.Civ.App.-Texarkana 1980, orig. proceeding); *Houtchens v. Matthews*, 557 S.W.2d 581, 587 (Tex.Civ.App.-Fort Worth 1977, writ dism'd); *In re McLemore*, 515 S.W.2d 356, 357 (Tex.Civ.App.-Dallas 1974, orig. proceeding).

7. *See supra*, note 3.

8. The issue of whether the amendment modified a child support obligation, and thereby required court approval to validly do so, thus remains for determination in connection with the child support claims that were severed from this case.

that amount was due, we have no basis to conclude that the amendment was without consideration.

■ With regard to the adequacy of that consideration, the requirement of consideration is not a safeguard against improvident contracts. RESTATEMENT (SECOND) OF CONTRACTS § 79 cmt. c (1981). Therefore, if consideration is found, there is no additional requirement of equivalence of values exchanged, and courts will not ordinarily inquire into the adequacy of consideration. *Id.* § 79(b) and cmt. c. However, gross inadequacy of consideration may be relevant to other issues, such as duress. *Id.* § 79 cmts. c, e; *see City of Lubbock v. Phillips Petroleum Co.,* 41 S.W.3d 149, 161 (Tex.App.-Amarillo 2000, no pet.). Therefore, we overrule Mackenzie's challenge to the existence of consideration, and we review her challenge to the adequacy of the consideration in the context of her duress contention, discussed in the following section.

## Economic Duress

■ Mackenzie contends that the amendment is also unenforceable because she signed it under economic duress caused by Sudan. Duress exists where: (1) there is a threat to do an act that the threatening party has no legal right to do; (2) the threat is of such a character as to destroy the free agency of the person to whom it is directed, causing him to do what he was not legally bound to do and would not otherwise do; (3) the restraint caused by the threat is imminent; and (4) the party against whom it is directed has no present means of protection.[9] Where an alternative may take the form of a legal remedy, a threat to breach a contract does not constitute duress unless there is evidence of some probable consequences therefrom for which the legal remedy afforded by the courts is inadequate. *Hartsville Oil Mill v. United States,* 271 U.S. 43, 49, 46 S.Ct. 389, 70 L.Ed. 822 (1926); RE-

9. *Dale v. Simon,* 267 S.W. 467, 470 (Tex. 1924); RESTATEMENT (SECOND) OF CONTRACTS § 175(1) (1981) (if a party's manifestation of assent to a contract is induced by an improper threat by the other party that leaves the first party no reasonable alternative, the contract is voidable by that party). Some Texas appeals court opinions list as additional elements that: (1) there is a an illegal exaction, fraud, or deception; and (2) for a claim of *economic* duress, that the party against whom it is claimed was responsible for the claimant's financial distress. *See, e.g., Simpson v. MBank Dallas, N.A.,* 724 S.W.2d 102, 109 (Tex.App.-Dallas 1987, writ ref'd n.r.e.). However, we can find no Texas Supreme Court opinion recognizing either of these as a separate element. Instead, the first seems to merely be an elaboration of the illegal threat element. *See Ward v. Scarborough,* 236 S.W. 434, 437 (Tex.1922) ("Duress of property cannot exist without there being a threat to do something which the threatening party has no legal right to do—some illegal exaction or some fraud or deception."). The second seems to have originated from the following passage:

It seems to be a settled principle of law that economic duress may be claimed only when the party against whom it is claimed was responsible for claimant's financial distress. In 17 C.J.S. *Contracts,* § 177 (1963), it is said: "A charge of economic duress or business compulsion must be based on the acts or conduct of the opposite party and not merely on the necessities of the purported victim, or on his fear of what a third person might do, and the mere fact that a person enters into a contract with reluctance, or as a result of the pressure of business circumstances, financial embarrassment, or economic necessity, does not, of itself, constitute business compulsion or economic duress invalidating the contract." *First Tex. Sav. Ass'n of Dallas v. Dicker Ctr. Inc.,* 631 S.W.2d 179, 185–86 (Tex.App.-Tyler 1982, no writ). However, because the Texas Supreme Court has never adopted any such requirement, and because we do not agree that it even follows from the quoted sentence of C.J.S., we decline to treat it as a required element of the defense of duress.

STATEMENT (SECOND) OF CONTRACTS § 175 cmt. b (1981). The test for causation, *i.e.,* whether the duress contributes substantially to the claimant's decision to assent, is subjective, considering all surrounding circumstances, such as the background and relationship of the parties and the emotional condition of the party claiming duress. *See* RESTATEMENT (SECOND) OF CONTRACTS § 175 cmt. c.

In this case, Sudan's motion for summary judgment asserted both that there was no evidence of each element of Mackenzie's duress claim and that the claim was defeated as a matter of law by evidence that, at the time the alleged duress took place: (1) Sudan had paid Mackenzie more than $1 million dollars and was current on all prior alimony payments; (2) Mackenzie's CPA was the one who suggested the $30,000 lump sum payment; (3) Mackenzie was working at a law firm and received assistance from that firm in finalizing the amendment; (4) Mackenzie had legal remedies to prevent Sudan from acting wrongfully; and (5) Mackenzie had access to competent legal counsel in Texas whom she subsequently hired to represent her in this case on a contingency basis.

Mackenzie's affidavit contained the following statements relevant to the duress issue:

> [During the divorce, Sudan] also told me that if I insisted on an investigation of [his law] firm's assets he would quit his job and go to work at the 7–11 and that I wouldn't get any money at all.

> During the negotiations to divide the community estate, Phil refused to provide information to me related to our community estate. Thus, instead of receiving my equitable division of [it], I took a payout over more than 15 years. To benefit Phil's tax situation, the money was characterized as contractual ali-

mony,.... I paid significant taxes on [it].

\* \* \* .

> [Daughter] Carly attended a therapeutic school ... in Colorado. Phil and [subsequent wife] Tracy found a school in Connecticut and decided they wanted Carly to go to school there. Carly and I went to Connecticut.... Phil called me in Connecticut and told me that if I didn't sign an agreement that said I would pay 50% of Carly's expenses (after what his health insurance paid), that she would have to leave Connecticut and that our trip would be a waste of time, even though the divorce decree said he had to pay 100% of expenses after insurance.

\* \* \*

> Phil never paid for Carly and [son] Robin's transportation when they visited me. If he bought an airline ticket for Carly and I was to see her, he required that I pay him money or he would not let us see each other. On another occasion, Phil arbitrarily and without my permission deducted $1,500.00 from my payments to pay for a consultant that he hired and with whom I was never able to meet. Phil would arbitrarily deduct money he thought I owed him from my monthly payments. I was powerless to stop him.

> In June 1998, Phil only paid me $11,000, not the $12,000 I was due under the Agreement. There were no payments, other than the $30,000 made in July 1998. Phil would violate the Divorce Decree and make me pay half of Carly's therapeutic school or he would not agree for her to attend. Carly needed the help and so, even though I was not required to do so by the Decree, I could not fight Phil and he deducted whatever he wanted, whether I agreed or not.

In July, 1998, five months after he married Tracy, Phil called at [sic] me at work. I was employed as a secretary for a law firm in Boulder, Colorado. [H]e said ... that he had decided he wasn't going to honor our contractual alimony agreement any longer because he didn't want to.... I was devastated, couldn't breath and told him that I had debts, expenses, a house payment, ... income taxes ... and how would I be able to afford to have Carly come home or to go see her and see Robin. He said he really didn't care about my situation and that he was through with me. I begged him to not make me lose my home and he said he didn't care if I didn't have a home. He reminded me that if I was going to fight him on any of this it would have to be done in the courts in Harris County....

I would not have agreed to the Amendment, but I had no choice, my free will was removed by Phil Sudan's pronouncement....

I had to sell my home in Boulder, leave my job, ... and move back to Houston in September, 1998. I also had to sell the house in Houston ... I could not live in it myself because I could not afford it....

I would not have agreed to the Amendment if I had had any other choice. Phil indicated that, if I did not sign, he would send no more money and I would be destitute. I needed the money to buy myself some time so that I did not lose more money than I was going to. I did not have an attorney. Phil's actions caused me so much turmoil that I was unable to think clearly regarding my options.

Taking the foregoing evidence as true, and indulging all reasonable inferences from it in favor of Mackenzie, this evidence is sufficient to raise fact issues as to whether: (1) Sudan threatened to make no further payments to Mackenzie under the agreement if she did not accept the amendment, which he had no legal right to do; (2) the threat was of such a character as to destroy Mackenzie's free agency (considering all surrounding circumstances, such as the background and relationship of the parties and Mackenzie's emotional condition),[10] and caused her to accept the $30,000 lump sum payment in satisfaction of all of Sudan's remaining obligations under the agreement, which she was not legally bound to do and would not otherwise have done; (3) the financial restraint from immediately losing all further payments under the agreement was imminent; and (4) Mackenzie had no present means of protection in being able to seek legal recourse from the courts at all or quickly enough to prevent the financial consequences that would otherwise result from Sudan's threatened breach of the agreement. Accordingly, we sustain Mackenzie's challenge to the summary judgment negating her duress contention.

### Intentional Infliction of Emotional Distress

■ Mackenzie's first issue also challenges the summary judgment against her claim for intentional infliction of emotional distress ("intentional infliction"). Among other things, Sudan's motion for summary judgment asserted there was no evidence that his conduct was extreme and outrageous. Mackenzie's brief contends that Sudan's conduct was extreme and outra-

---

**10.** *Cf. Williams,* 821 S.W.2d at 144–45 (recognizing the financial coercion that can occur following a divorce in which a payee ex-spouse facing financial difficulties is pressured into accepting a lower payment rather than risk the delay, expense, and uncertainty associated with trying to collect the agreed upon amounts).

geous in that he emotionally abused her and attempted to establish control over her through the use of money and threats to interfere with her relationship with their children.

 To prevail on her claim for intentional infliction, Mackenzie would have to prove that: (1) Sudan acted intentionally or recklessly; (2) his conduct was extreme and outrageous; (3) his actions caused Mackenzie emotional distress; and (4) her emotional distress was severe. *See Tex. Farm Bureau Mut. Ins. Co. v. Sears*, 84 S.W.3d 604, 610 (Tex.2002). To be extreme and outrageous, a defendant's conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society. *Id.* Conduct that is merely insensitive or rude is not extreme and outrageous. *Id.* Likewise, mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not rise to the level of extreme and outrageous conduct. *Id.*

 The court decides whether a defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. *Id.* In deciding whether particular conduct rises to this level, courts consider both the conduct's context and the parties' relationship. *Id.* at 610–11. Although a defendant's motive or intent is relevant to an intentional infliction of emotional distress claim, it is not enough to support liability. *Id.* at 612. Rather, the

conduct itself must be extreme and outrageous. *Id.*

In this case, Mackenzie does not cite a case in which the type of conduct she alleges has been found actionable for intentional infliction. Nor does she specify any particular instance in which Sudan's alleged conduct can objectively be characterized as so outrageous in character and extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society. Under these circumstances, Mackenzie has failed to demonstrate error in granting summary judgment against her intentional infliction claim, and her first issue is overruled with regard to it.

## Tortious Interference

 Mackenzie's first issue also challenges the summary judgment against her claim for tortious interference with business relations.[11] Among other grounds pertaining to this claim, Sudan's motion for summary judgment asserted that there was no evidence that he directed any conduct to any third party with whom Mackenzie had a business relationship.[12] Neither Mackenzie's summary judgment response nor her appellate brief sought to challenge this contention legally or factually. Where, as here, summary judgment against a claim is sought on multiple alternative grounds, an appellant's failure to challenge each ground asserted allows the summary judgment to be affirmed on the

11. Mackenzie claims that Sudan interfered with her business relationships with her bank, mortgage company, insurance company, and employer by: (1) informing her of his intent to stop making payments under the agreement, which were necessary for her to maintain those relationships; (2) verbally abusing her; and (3) thereby coercing her to enter into the amendment.

12. *See, e.g., Holloway v. Skinner*, 898 S.W.2d 793, 794–95 (Tex.1995) (recognizing tortious interference as a claim by a party to a contract against a third person for wrongly inducing another contracting party to breach the contract).

unchallenged ground(s).[13] Because Mackenzie has not challenged Sudan's summary judgment ground asserting no evidence of interference with any party with whom Mackenzie had a business relationship, she has not demonstrated error in granting summary judgment against her tortious interference claim.

## Fraudulent Inducement

Sudan moved for summary judgment against Mackenzie's claim for fraudulent inducement of the agreement, asserting, among other things, that there was no evidence that Sudan made any actionable misrepresentation. Mackenzie challenges the summary judgment against this claim on the ground that the following are evidence that Sudan entered into the agreement with no intention of performing it: (1) at the time the agreement was negotiated (leading up to the divorce), Sudan refused to disclose, or allow Mackenzie to share in, the value of his law practice or his retirement account; (2) in the divorce, Sudan would not let Mackenzie keep her dream house and forced her to find another place for her and their children to live; and (3) a few months after his re-marriage, Sudan decided the agreement was no longer fair and unilaterally breached it.

A promise of future performance constitutes an actionable misrepresentation if, at the time it was made, the promisor had no intention of performing it. *See Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998). However, the mere failure to perform a contract is not evidence of fraud. *Id.* Rather, there must be evidence relevant to the promisor's in-

tent at the time the promise was made. *See id.*

In this case, of the three items of evidence, enumerated above, upon which Mackenzie relies to show fraudulent inducement, the first two may arguably support an inference of bitterness or belligerence but are not probative of Sudan's intent with regard to performing the agreement. Similarly, the third item is evidence of only the subsequent breach and not Sudan's intent at the time of entering into the agreement. In that Mackenzie has not cited evidence of Sudan's intent at that time not to perform the agreement, she has not demonstrated that summary judgment was entered against her fraudulent inducement claim in error, and her first issue is overruled.

Accordingly, we: (1) affirm the judgment as to all issues other than Mackenzie's challenge to the validity of the amendment based on economic duress; and (2) reverse the portion of the summary judgment pertaining to that issue and remand it to the trial court for further proceedings.

SEYMORE, J., dissenting.

CHARLES W. SEYMORE, Justice, dissenting.

I respectfully dissent to that portion of the majority opinion sustaining Mackenzie's challenge to Sudan's motion for summary judgment on Mackenzie's claim of economic duress. It is my considered opinion that the averments in Mackenzie's affidavit are not sufficient to raise a fact issue on economic duress. Duress is an affirmative defense in confession and avoidance of the affirmative defense of re-

---

13. *See Guzman v. Carnevale,* 964 S.W.2d 311, 313 (Tex.App.-Corpus Christi 1998, no pet.); *Beavers v. Goose Creek Consol. Indep. Sch. Dist.,* 884 S.W.2d 932, 934 (Tex.App.-Waco 1994, writ denied); *Langston v. Eagle Publ'g Co.,* 719 S.W.2d 612, 615 (Tex.App.-Waco 1986, writ ref'd n.r.e.).

lease. *Brown v. Cain Chem., Inc.,* 837 S.W.2d 239, 242–43 (Tex.App.-Houston [1st Dist.] 1992, writ denied). There can be no duress without the following: (1) a threat or action taken without legal justification; (2) the action or threat was of such a character as to destroy the other party's free agency; (3) the threat or action overcame the party's free will and caused her to do that which she would not otherwise have done and that which it was not legally bound to do; (4) the restraint was imminent; and (5) the opposing party had no present means of protection. *HRN, Inc. v. Shell Oil Co., et al.,* 102 S.W.3d 205, 215 (Tex.App.-Houston [14th Dist.] 2003 pet. granted). *See also, Chapman Children's Trust v. Porter & Hedges, L.L.P.,* 32 S.W.3d 429, 443.

Accepting Mackenzie's statements as true, I find her affidavit to be conclusory relative to the following elements of economic duress: (1) imminency of restraint from doing what she would have otherwise not done, and (2) no present means of protection when the amendment was signed. The bare assertion that she did not have an attorney is ineffective to prevent entry of summary judgment. *HRN Inc.,* 102 S.W.3d at 216; *see also, Burrow v. Arce,* 997 S.W.2d 229, 235–36 (Tex.1999); *In re Am. Home Prods. Corp.,* 985 S.W.2d 68, 74 (Tex.1998). Clearly, Mackenzie could have initiated this suit for temporary orders and enforcement of the divorce decree *before* signing the amendment which is the subject of this appeal. Accordingly, I would not sustain Mackenzie's challenge to the summary judgment negating her economic duress contention.