

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-14-00186-CV

IN RE JACOB LEDESMA GUERRERO, RELATOR

Original Proceeding

June 13, 2014

## OPINION

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

Relator, Jacob Ledesma Guerrero, has filed his petition for writ of mandamus in which he asks this Court to compel Respondent, the Honorable Dan Mike Byrd, presiding judge of the 46th District Court of Wilbarger County, to vacate his temporary order naming Relator and Real Party in Interest, the maternal grandmother of Relator's son, as joint managing conservators of Relator's son, A.J.G., with Real Party in Interest given the right to designate the child's residence. Relator also contends that the trial court's denial of his petition for habeas corpus seeking immediate possession of his son represented an abuse of discretion and a failure to fulfill a ministerial duty for which he has no adequate remedy at law. For the reasons outlined below, we will conditionally grant mandamus relief as it relates to Relator's requested habeas corpus relief.

Factual and Procedural History

## Custodial Arrangements and Caretakers

Relator and Kristina Ramirez had a son, A.J.G., in 2006. The family lived together for a number of years but, in 2011 or 2012, when the boy was about five years old, the couple separated. Kristina took primary custody of A.J.G., and Relator regularly exercised visitation and duly paid child support. Both parents were named joint managing conservators in the 2012 order detailing custody and possession of A.J.G.

Both parents worked. Kristina often held two jobs, one of which called on her to work the overnight shift. When she worked the overnight shift, A.J.G. typically stayed overnight with Kristina's mother and Real Party in Interest, Marguerite Ramirez. Ramirez would frequently care for A.J.G. while Kristina worked; Ramirez was often the person who took him to and from school, helped him with homework, prepared meals, took care of his health, arranged social outings, and other general "parenting things."

Unexpectedly, Kristina passed away in January 2014. Shortly thereafter, Relator made preparations to take custody of his son. However, Ramirez, among others, believed that it would be best for A.J.G. if he were to stay with Ramirez, as he had been doing so frequently at any rate, and for the boy's routine to stay as consistent as possible, especially in light of his traumatic loss.

## Initiation of Court Proceedings

Though Relator had sought legal assistance within five or so days of Kristina's passing, it was Ramirez who initiated court proceedings, filing on February 18, 2014,

her "Agreed Petition to Modify the Parent-Child Relationship" under the existing cause number involving A.J.G.'s custody. In her petition, Ramirez sought to be named sole managing conservator of A.J.G. and for Relator to be named possessory conservator. In response, Relator filed his plea to the jurisdiction, motion to dismiss, general denial, and special exceptions. He also filed, under separate cause number, his petition for writ of habeas corpus seeking immediate possession of A.J.G. The trial court consolidated the matters to be heard and, on March 13, held a hearing on Ramirez's standing to bring suit and on Relator's petition for writ of habeas corpus.

A.J.G.'s Mild Autism and Preference for Routine

At the hearing, Ramirez explained that A.J.G. suffers from mild autism. His teachers testified that he has good communication skills but, at times, becomes reluctant to do certain work and has definite routines, especially in terms of food, that he prefers to maintain. Deviation from his routines could cause behavioral issues. According to one teacher, A.J.G.'s discipline issues were pretty much "normal kid stuff." Otherwise, he does well at school and is "a very loving sweet little boy."

His maternal grandmother, Ramirez, explained that A.J.G. does not deal well with change and that deviation from his ordinary routine can cause him to shut down or act out, sometimes in the form of tantrums in which he throws his toys. She explained that because A.J.G. is already accustomed to the routine of staying with her and sleeping at her house at least five or six nights a week, while his late mother had worked the night shift, it was best for A.J.G. that the parties maintain the status quo.

3

<u>Witnesses' Evaluation of Relator as Parent</u>

Relator, Ramirez, and five other people testified at the evidentiary hearing. By all accounts, Relator does not pose a risk of imminent danger to his son. The record suggests that Relator has a full-time, night-shift job at Walmart making over ten dollars an hour and has held the job for about two years. After Relator and Kristina separated, Relator exercised visitation with his son, though Ramirez was dissatisfied with the length of visitation he exercised. Relator always paid child support for A.J.G.

By her own admission, Ramirez recalled no recent history of alcohol or drug abuse on Relator's part. A.J.G.'s teacher recalled Relator as a parent who had been actively involved with A.J.G.'s school. Weighing against Relator as a parent, in the eyes of at least two witnesses, was the fact that he did not have a vehicle. Further, he seemed to be inclined to play video games for what some witnesses would say is far too long, to the point of addiction. Relator admitted to playing video games daily but explained that he also liked to involve his son in the games. Additionally, there appeared to be some concern when Relator named both his mother and his brother—A.J.G.'s paternal grandmother and uncle—as family members who could assist in taking care of the boy. The concern centered on the fact that Relator seemed to know very little about his brother, who may have suffered from autism or developmental delays of some variety according to some accounts.

Relator's estranged sister testified and, when asked what concerned her about her brother having custody of A.J.G., she responded simply that she does not "think he's ready right now." She observed that Relator's household was not yet stable

4

enough to meet the special needs of A.J.G. She maintained that A.J.G. was in a stable environment right now with Ramirez and that her nephew "needs a routine, stability." She explained that "it would be better" for A.J.G. "[t]o be with his grandmother."

All in all, the evidence shows that Relator was an involved, caring, and seemingly fit father who, when Kristina suddenly died, was, perhaps, forced to scramble to get child care and other arrangements in order so that he could take custody of A.J.G. He sought legal assistance in making all the custodial and legal arrangements within approximately five days of Kristina's passing. The evidence also shows that Ramirez was a loving and caring grandmother to A.J.G. and that she could provide A.J.G. a stable home and, for now, a more familiar environment and a more consistent routine.

The Trial Court's Findings and Rulings; Mandamus Sought

Recognizing that those involved seemed to have A.J.G.'s sensitive nature at heart and that the parties loved and cared for the boy, the trial court attempted to be very accommodating and balanced in terms of granting visitation to Relator that would maximize time spent between Relator and his son and that would also be cautious in terms of minimal disruption to A.J.G.'s schedule. The trial court encouraged the parties to continue to treat one another with civility and respect, and it also proposed ideas that may foster a cooperative approach to caring for A.J.G. The trial court agreed generally with the observation that Relator was "perhaps not quite ready to take over this kind of challenge." But it further observed that, most likely, as Relator made preparations and arrangements, the parental presumption that favors a natural parent would eventually

5

prevail, favor Relator, and entitle him to possession of his son. The trial court encouraged Relator and Ramirez to cooperate in A.J.G.'s care.

The trial court denied Relator's plea to the jurisdiction, found that Ramirez did have standing "primarily [under Texas Family Code Section] 102.004," and further named Relator and Ramirez as joint managing conservators with Ramirez having been given the right to designate the primary residence for A.J.G. The trial court orally rendered temporary orders to that effect and also expressly denied Relator's petition for writ of habeas corpus.[1]

Relator filed his petition for writ of mandamus in this Court on May 9, 2014. We sought a response from Ramirez, and said response was filed on May 23. We have carefully studied the issues raised in the petition, the position advanced in response, and the law governing the matters. From that, we have concluded that the trial court erroneously denied Relator's petition for writ of habeas corpus seeking immediate possession of A.J.G. and that, in light of such conclusion, we need not address the remaining issues related to the trial court's temporary orders rendered March 13, 2014.

---

[1] Rendition of judgment is the pronouncement by the court of its conclusions and decision upon the matter submitted to it for adjudication. *Buffalo Bag Co. v. Joachim*, 704 S.W.2d 482, 483 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). A trial court renders judgment when it officially announces its decision either orally in open court or by a memorandum filed with the clerk of the court. *Comet Aluminum Co. v. Dibrell*, 450 S.W.2d 56, 58 (Tex. 1970) (orig. proceeding). If a trial court's order is adequately reflected in the reporter's record, a formal written order is not essential to obtaining mandamus relief. *In re Vernor*, 94 S.W.3d 201, 207 n.8 (Tex. App.—Austin 2002, orig. proceeding); *In re Perritt*, 973 S.W.2d 776, 779 (Tex. App.—Texarkana 1998, orig. proceeding); *see* TEX. R. APP. P. 52.3(k)(1)(A). If the complained-of order is an oral order, the portion of the reporter's record that contains the order must be included in the petition's appendix. *In re Bill Heard Chevrolet, Ltd.*, 209 S.W.3d 311, 314 (Tex. App.—Houston [1st Dist.] 2006, orig. proceeding) (citing *In re Vernor*, 94 S.W.3d at 207 n.8). Further, with respect to the trial court's ruling on Relator's petition for habeas corpus, we may look at Relator's complaint as one directed at Respondent's failure to render a judgment—oral or written— granting Relator the relief to which he claims to have shown himself entitled.

6

Availability of Mandamus and Applicable Law

Availability of Mandamus Relief

Generally, "[w]e grant the extraordinary relief of mandamus only when the trial court has clearly abused its discretion and the relator lacks an adequate appellate remedy." *See In re Team Rocket, L.P.*, 256 S.W.3d 257, 259 (Tex. 2008) (orig. proceeding). Mandamus may also issue to compel a government officer to perform a ministerial duty. *See Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992) (orig. proceeding). Mandamus has been used as a vehicle to compel enforcement of a relator's right to possession of a child in a habeas corpus proceeding. *Armstrong v. Reiter*, 628 S.W.2d 439, 440 (Tex. 1982) (orig. proceeding); *In re Kubankin*, 257 S.W.3d 852, 858 (Tex. App.—Waco 2008, orig. proceeding) (per curiam).

Right to Habeas Corpus in this Context

A district court must hear an application for writ of habeas corpus concerning the proper legal custodian of a child and make its determination solely on the basis of who, at that time, has the legal right to custody. *In re Jones*, 263 S.W.3d 120, 123 (Tex. App.—Houston [1st Dist.] 2006, orig. proceeding) (citing *Greene v. Schuble*, 654 S.W.2d 436, 438 (Tex. 1983) (orig. proceeding)).

We look first to whether the denial of habeas relief in this context can be an abuse of discretion or a failure to perform a ministerial duty. Absent evidence of a dire emergency, the trial court is required to issue a writ of habeas corpus once the relator has demonstrated the bare legal right to possession of the child; at that point, issuance

of the writ should be automatic, immediate, and ministerial. *See Schoenfeld v. Onion*, 647 S.W.2d 954, 955 (Tex. 1983) (orig. proceeding) (per curiam); *In re Kubankin*, 257 S.W.3d at 857; *In re deFilippi*, 235 S.W.3d 319, 322 (Tex. App.—San Antonio 2007, orig. proceeding) (per curiam). More precisely, once a relator has established his or her legal right to possession of the child, the trial court's authority to deny habeas corpus relief becomes very limited. *See In re deFilippi*, 235 S.W.3d at 323; *In re Lau*, 89 S.W.3d 757, 759 (Tex. App.—Houston [1st Dist.] 2002, orig. proceeding). In fact, the trial court has no discretion to deny the writ and issue any other temporary order unless the party opposing the return of the child to the one seeking it presents evidence raising "a serious immediate question concerning the welfare of the child." *See* TEX. FAM. CODE ANN. § 157.374 (West 2014); *In re Lau*, 89 S.W.3d at 759. A serious and immediate question concerning the child's welfare requires proof of an imminent danger to the child's physical or emotional well-being, or, put another way, a dire emergency. *In re deFilippi*, 235 S.W.3d at 324 (citing *Schoenfeld*, 647 S.W.2d at 955, and *McElreath v. Stewart*, 545 S.W.2d 955, 958 (Tex. 1977) (orig. proceeding)).

So, once the relator establishes a bare legal right to possession of the child and in the absence of evidence of a dire emergency, issuance of habeas corpus relief is not a discretionary matter for the trial court to decide; issuance then becomes a matter of right. *See In re Jones*, 263 S.W.3d at 123. With that, unless the record establishes and the trial court finds that the child is in imminent danger of physical or emotional harm in the relator's possession and that immediate action is necessary to protect the child from said harm, the trial court will lack the authority to deny habeas corpus relief to a party with the legal right to immediate possession. *See In re deFilippi*, 235 S.W.3d at 324.

We next look to whether one who is wrongfully denied habeas corpus relief in this context has an adequate remedy at law. It is well-established that a trial court's order granting or denying a writ of habeas corpus in a child-custody case is not an appealable order. *See, e.g.*, *Gray v. Rankin*, 594 S.W.2d 409, 409 (Tex. 1980) (per curiam). So, mandamus may lie to correct the erroneous denial of habeas corpus relief under the Texas Family Code because, (1) under certain circumstances, the trial court's denial of habeas corpus relief to one seeking possession of a child may be either an abuse of discretion or, looking at it another way, a failure by the trial court to fulfill its ministerial duty; and (2) the erroneous denial of habeas corpus relief is an order from which one denied possession has no adequate remedy at law. *See In re deFilippi*, 235 S.W.3d at 324; *see also Gray*, 594 S.W.2d at 409.

Establishing the Bare Legal Right to Possession

If the right to possession of a child is governed by a court order, the trial court shall compel the return of a child if it finds that the party seeking relief is entitled to possession of the child under the court order. *See* TEX. FAM. CODE ANN. § 157.372 (West 2014); *In re deFilippi*, 235 S.W.3d at 321. If the right to possession of a child is *not* governed by a prior order, the trial court in a habeas corpus proceeding involving the right of possession of the child has the following options: (1) it shall compel return of the child to the parent if the right of possession is between a parent and a nonparent and a suit affecting the parent-child relationship has not been filed; or (2) it may either compel return of the child or issue temporary orders under Chapter 105 if a suit affecting the parent-child relationship is pending and the parties have received notice of

9

a hearing on temporary orders set for the same time as the habeas corpus proceeding. TEX. FAM. CODE ANN. § 157.376 (West 2014).[2]

On Survival of 2012 Order Governing Possession

There remains some issue here whether the 2012 order naming Relator and Kristina as joint managing conservators of A.J.G. survived the death of Kristina for the purposes of determining the right to possession by habeas corpus. Generally, in the absence of specific provisions to the contrary in an order establishing conservatorship, the death of the managing conservator ends the conservatorship order, and it no longer constitutes a valid, subsisting court order in the context of a petition for writ of habeas corpus seeking possession of a child. *See Greene*, 654 S.W.2d at 437–38; *see also Lewis v. McCoy*, 747 S.W.2d 48, 49 (Tex. App.—El Paso 1988, orig. proceeding) (in custody dispute involving possessory conservator father, recognizing *Greene*'s holding to be that, upon death of managing conservator mother, custody portion of divorce decree no longer constituted valid order governing possession of child).[3]

---

[2] Regardless of whether the language of Section 157.376(a)(2) permits the trial court some amount of discretion when (1) no existing court order governs possession of the child and (2) a suit affecting the parent-child relationship is then-pending in the trial court along with the petition seeking habeas corpus relief, the "proper measure" for evaluating the evidence in a case of this nature remains the same: a "serious and immediate question concerning the [child]'s welfare." *See In re deFilippi*, 235 S.W.3d at 323; *see also* TEX. FAM. CODE ANN. § 157.374 ("Notwithstanding any other provision of this subchapter, the court may render an appropriate temporary order if there is a serious immediate question concerning the welfare of the child.").

[3] We question whether the instant case falls within the rule in *Greene* because *Greene* and its progeny seem to have involved the death of *the* managing conservator, leaving at issue the right to possession of either a possessory conservator or another untitled third party. Here, both the late Kristina and Relator were named *joint* managing conservators in the 2012 order. So, it is at least arguable that the 2012 order naming Relator as a managing conservator was still effective as to conservatorship of the child. We need not directly address that particular issue because Relator has established a superior right to possession of A.J.G., be it by court order as a joint managing conservator or by the virtue of him being the surviving natural parent of A.J.G. *See Greene*, 654 S.W.2d at 438 (concluding that a "surviving parent" has the right to possess the child in the event of the death of the managing conservator); *see also*

10

The *Greene* court also went on to announce as follows: "We adhere to the rule we stated prior to the adoption of the [Texas] Family Code that[,] in the event of the death of the managing conservator, the surviving parent has a right to possession of the children, and a court may enforce this right by issuance of a writ of habeas corpus." 654 S.W.2d at 438. The Fort Worth court has attempted to clarify *Greene*'s rationale:

> The rationale is that because the managing conservator parent has died, someone must take immediate possession of the children, and the possessory conservator parent's right of immediate possession is superior to others' rights. *See* TEX. FAM. CODE ANN. § 157.372 (recognizing that right to possession of child in habeas corpus proceeding is governed by any existing custody order); *see id.* § 157.376 (recognizing that, if no order exists governing right to possession of the child, child shall be returned to parent if the right of possession is between a parent and a nonparent).

*In re P.D.M.*, 117 S.W.3d 453, 459–60 (Tex. App.—Fort Worth 2003, pet. denied) (en banc). So, too, it would seem a surviving joint managing conservator parent's rights are "superior to others' rights." *See Blackwell v. Humble*, 241 S.W.3d 707, 722 (Tex. App.—Austin 2007, no pet.) (citing *In re P.D.M.* to support conclusion that, "[i]f a child's managing conservator dies or is incapacitated and the right to possession of the child is not governed by an order, a parent has superior rights of possession over a non-parent").

So, importantly and seemingly without regard to the survival of a prior order for habeas corpus purposes, in the event of the death of the managing conservator of the child, the surviving parent has a right to possession of the child, and a trial court should enforce this right by issuance of a writ of habeas corpus. *See Greene*, 654 S.W.2d at

*In re deFilippi*, 235 S.W.3d at 322 (observing surviving father's superior rights to possession per *Greene* and adding that father "possesse[d] a fundamental, constitutional right to the care, custody, and control of his children").

11

438; *In re deFilippi*, 235 S.W.3d at 322; *see also Klein v. Cain*, 676 S.W.2d 165, 172 (Tex. App.—Amarillo 1984, orig. proceeding) (concluding that, upon managing conservator's death, surviving parent and possessory conservator who had exercised regular visitation was entitled to possession of the children). Indeed, *Greene*'s rule is consistent with the gravity and caution with which a person's parental rights are treated on both state and federal levels. *See Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (plurality opinion) (reiterating the Court's "cardinal" rule "that the custody, care and nurture of the child reside first in the parents"); *In re Derzapf*, 219 S.W.3d 327, 334–35 (Tex. 2007) (orig. proceeding) (noting *Troxel*'s position that parent's interest in care, custody, and control of his or her child "is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme Court of the United States]").

## Analysis

Initially, we observe that the record establishes that Relator is both the surviving managing conservator of A.J.G. and A.J.G.'s father. As against all others, either status gives to Relator superior rights to possess A.J.G., in light of the death of A.J.G.'s mother. *See Greene*, 654 S.W.2d at 438. That being so, the record demonstrates Relator's bare legal right to possession of A.J.G. We need only determine now whether the evidence before the trial court raised a serious, immediate question concerning A.J.G.'s welfare in Relator's care. *See* TEX. FAM. CODE ANN. § 157.374.

Keeping in mind that courts have treated this measure of evidence as a fairly burdensome one, we turn to the record of the hearing held on March 13. *See In re*

12

*deFilippi*, 235 S.W.3d at 324 (observing that "Texas appellate courts have repeatedly held that a serious and immediate question concerning the children's welfare requires proof of an imminent danger to the children's physical or emotional well-being, or, stated another way, a dire emergency"). The record reveals that Relator has provided financial support for A.J.G. since the parents' separation, has maintained regular visitation with his son, and stays involved with his school functions. Relator acted as the boy's primary caregiver for several years before the parents' separation, and no evidence suggests that any harm ever came to A.J.G. as a result of Relator's care. Relator has had a steady job and reports that he has an adequately stocked two-bedroom house that he and A.J.G. may live in comfortably.

The record reveals at least one obstacle for Relator: no vehicle for transportation. And the record shows what some may consider a flaw or weakness in Relator's parenting approach: his long periods of video game play. It may be, too, that Relator should carefully review backgrounds and personalities of those within his own family in whose care he may leave A.J.G. for periods of time. Nonetheless, based on the record before us, we see no serious, immediate question concerning A.J.G.'s welfare in Relator's care.[4] As Ramirez testified, A.J.G. may need time to adjust, but such periods of adjustment hardly seem avoidable as he adjusts to the tragic loss of his mother at such a tender age. It may be that the change in his routine will lead to instances of A.J.G. acting out as he adjusts. This, however, does not rise to the level of a "dire

---

[4] We note that one area of past concern is no longer an issue and could no longer serve to raise a serious and immediate question concerning A.J.G.'s welfare. Relator's girlfriend, about whose criminal background Kristina was once concerned, was no longer a part of Relator's life, having stolen his car and moved to the Northwest. There is no evidence in the record that this woman is a part of Relator's life. Further, it would seem that, despite her concerns, Kristina permitted visitation between Relator and A.J.G. to continue.

emergency" or an "imminent danger" to A.J.G.'s physical or emotional well-being; "it is well-established that merely removing a child from a familiar environment does not rise to the level of a serious and immediate question concerning a child's welfare in the habeas corpus context." *See In re deFilippi*, 235 S.W.3d at 325; *see also Klein*, 676 S.W.2d at 172 (observing that evidence "that the child's emotional well-being is better served by not changing his home and lifestyle . . . falls far short of circumstances of immediacy and seriousness required by the statute to authorize the temporary order" in lieu of issuance of writ of habeas corpus in favor of relator).

Ramirez recounted a conversation in which she claims to have discussed sharing joint custody of A.J.G. with Relator, certainly an indication that Ramirez did not consider Relator an imminent danger to the boy. In keeping with that sentiment, Ramirez explained that she is not keeping A.J.G. from his father entirely; indeed, her testimony indicates that she has made no effort to do so. On cross-examination, Ramirez testified to speculative illustrations of ways in which A.J.G. may be physically harmed in Relator's care, but those examples sounded more in terms of questioning the quality of the time that Relator and A.J.G. spend together:

| | |
|---|---|
| Counsel: | Now, you also said you believed he would be physically harmed if placed in [Relator]'s care? |
| Ramirez: | Yes. |
| Counsel: | So is [Relator] going to burn him or beat him? |
| Ramirez: | No. |
| Counsel: | So how is he going to be physically harmed? |
| Ramirez: | Just because of the way A.J.[G.] is. You know you have to be around him to understand what that means. |

14

Counsel:      Can you point to any physical harm that you think that [Relator] is going to impose on [A.J.G]?

Ramirez:     Well, is he going to get him out or keep him isolated? Is he going to be out like doing things, to the park and other things?

When asked if A.J.G. would be "okay physically and mentally" if placed with Relator, she responded only that the adjustments A.J.G. would have to make "would take time."

That Ramirez may be a *better* choice as primary caretaker for A.J.G. at this point is of no consequence in this particular analysis. That she may provide to A.J.G. a more familiar environment and steadier routine is likewise irrelevant. In fact, it may well be better for A.J.G. to remain in a familiar place and visit Relator in keeping with his established routine, but we need not determine whether the record supports such a finding by the trial court. The fact remains that the record does not raise any serious and immediate question concerning A.J.G.'s welfare in Relator's possession. Even were we to conclude that the record supports a finding that it was in A.J.G.'s best interest to remain in Ramirez's care, the trial court may not deny Relator's petition based solely on the child's best interest. *See Schoenfeld*, 647 S.W.2d at 955. In a habeas corpus proceeding, the trial court is not permitted to consider the child's best interest and may not go beyond the immediate welfare of the child. *See In re deFilippi*, 235 S.W.3d at 322; *Klein*, 676 S.W.2d at 172 (concluding that relator was wrongfully denied relief when trial court "improperly relitigated the right to possession 'in the best interest of the child'").

Here, the record established Relator's right to possession of A.J.G. and raised no serious, immediate question concerning the boy's welfare in Relator's care. We,

15

therefore, conclude that Relator was entitled to immediate possession of A.J.G., his right to possession was enforceable by writ of habeas corpus, it was an abuse of discretion and/or a failure to perform a ministerial duty for Respondent to deny him such, and mandamus will issue to correct Respondent's denial of Relator's petition.

Conclusion

Upon Relator having established his superior legal right to possession of A.J.G. and in the absence of evidence raising a serious, immediate question concerning A.J.G.'s welfare, the trial court had a ministerial duty to order the return of A.J.G. to Relator, his father, and lacked any discretion to deny Relator's petition for writ of habeas corpus. Accordingly, we conditionally grant Relator's petition for writ of mandamus and, in doing so, compel Respondent to vacate his order denying Relator's petition for writ of habeas corpus and, in its stead, order that A.J.G. be immediately returned to the possession of his father, Relator. See TEX. R. APP. P. 52.8(c). To the extent that the temporary orders naming Relator and Ramirez joint managing conservators and giving Ramirez the right to designate A.J.G.'s residence are inconsistent with Relator's right to immediate possession of A.J.G., we further direct Respondent to vacate those orders.[5]

Confident that Respondent will promptly enter an order consistent with this opinion, we will direct the Clerk of this Court to issue the writ of mandamus only in the

---

[5] Thus, we need not and do not reach those issues concerning Ramirez's standing under the Texas Family Code to bring a suit of this nature. Nor do we reach the issues as to the merits of the temporary orders. In the event those issues are raised again either by original proceeding or direct appeal, our opinion in the instant case will not be read to speak on such issues, as we expressly dispose of the instant cause solely in terms of the trial court's erroneous denial of Relator's petition for writ of habeas corpus. The effect on the other issues raised is nothing more than the natural consequences of our conditional issuance of mandamus on the orders rendered on March 13, 2014.

16

event that Respondent fails to comply with this Court's directive within fifteen days of the date of this opinion.



                                      Mackey K. Hancock
                                           Justice